Belknap County Probate Court
No. 2000-748

## IN RE CRAIG T. AND MEGAN T.

Argued: March 6, 2002
Opinion Issued: May 24, 2002

*Brian P. McEvoy*, of Laconia, by brief and orally, for the respondent, Jo Ann T.

*Philip T. McLaughlin*, attorney general (*Laura E.B. Lombardi*, attorney, on the brief and orally), for the State.

DUGGAN, J. The respondent, Jo Ann T., appeals a Belknap County Probate Court (*O'Neill*, J.) order terminating her parental rights over her children, Craig T. and Megan T. *See* RSA 170-C:5, III, :10 (1994 & Supp. 2001). On appeal, she argues that the probate court applied the wrong legal standard when it granted the petition to terminate her parental

rights. She also contends the evidence was insufficient to support the probate court's findings. We affirm.

In February 1998, the petitioner, the New Hampshire Division for Children, Youth and Families (DCYF), filed two neglect petitions in Laconia District Court against the respondent on behalf of her children, Craig T. and Megan T. *See* RSA ch. 169-C (1994 & Supp. 2001). In the first petition, DCYF alleged that the respondent was present and failed to intervene when Todd T., her husband and the children's father, was observed shaking and violently striking Craig, then age three. In the second petition, DCYF alleged that she failed to protect Megan, then age five, from witnessing that traumatic event, which was likely to cause substantial harm to Megan's physical, mental and emotional health. The accounts that provided the factual basis for the neglect petitions are more fully described in *In re Craig T.*, 144 N.H. 584 (1999).

Following an adjudicatory hearing in April 1998, the district court found that the respondent had neglected the children. *See* RSA 169-C:18, :21. After the final dispositional hearing, the district court ordered custody of the children to remain with DCYF while permitting the respondent visitation supervised by a parent aide. *See* RSA 169-C:19, II(a)(2), III(a) (Supp. 2001). The parent aide was to schedule regular meetings with the respondent to discuss the goals and status of visitation. The district court also ordered the respondent to complete a psychological evaluation, *see* RSA 169-C:16, III, to participate in counseling to address family violence issues, *see* RSA 169-C:19, IV, and to cooperate with DCYF in scheduling and keeping appointments related to the court order.

The respondent maintained supervised visitation with the children weekly from May 1998 through June 18, 1998. Following her June 18, 1998 visit, the respondent's parent aide sent her a letter informing her that her visits were suspended until she scheduled a meeting with her DCYF caseworker and her parent aide. The respondent called her parent aide the following day to report that she would not be able to schedule a meeting with her DCYF caseworker until her caseworker returned to the office at the end of June. Weekly visits resumed on July 10, 1998.

On July 28, 1998, the respondent failed to confirm a visit that she had specially requested to celebrate Megan's birthday. Because she failed to confirm the visit, the children were not transported to the visitation site. When the respondent learned that she would not be able to visit with the children that day, she expressed her frustration to her parent aide and stated that she was going out of town for a while but would call upon her return.

The respondent's parent aide sent her a letter on July 30, 1998, requesting that she call to schedule a meeting to discuss the status of

visitation. The respondent did not respond. On August 12, 1998, the respondent's parent aide sent her another letter requesting that she set up a meeting to discuss the status of visitation. Again, the respondent did not respond. Finally, the respondent's parent aide and her DCYF caseworker scheduled a meeting and notified the respondent of the meeting by letter sent August 18, 1998. The respondent did not attend the meeting. On August 31, 1998, the respondent's parent aide sent a letter notifying her that the parent aide agency was suspending her supervised visits with the children because she failed to attend the meeting.

The respondent called her DCYF caseworker on October 2, 1998, and scheduled a meeting for the next week. At the meeting, the respondent expressed her desire to resume visitation. Her DCYF caseworker requested that she first make an effort to comply with the court orders by obtaining a psychological evaluation and participating in counseling before resuming visitation. Her DCYF caseworker testified that she made these requests because she was concerned about the respondent's commitment to the children, given the amount of time that had passed since the last visit, as well as her commitment to correcting the conditions that led to the neglect findings. The respondent, with her DCYF caseworker's assistance, made an appointment for a psychological evaluation, but then did not appear at the appointed time.

The respondent did not contact her DCYF caseworker again until December 1998, when she called to arrange delivery of Christmas gifts for the children. Her DCYF caseworker scheduled a time for her to drop off the gifts and to discuss the status of the case. The respondent did not appear at the scheduled time, but instead dropped the gifts off at a time when her DCYF caseworker was not available. The respondent next contacted her DCYF caseworker in March 1999. At that time, she asked to resume visitation and reported that she had been attending a domestic violence batterer's group. She stated, however, that she did not see the point in attending and was going only to satisfy her caseworker.

In April 1999, the district court held a review hearing. See RSA 169-C:24. At the hearing, the court found that the respondent was "in non-compliance with the present District Court Dispositional orders." As a result, the court ordered DCYF to establish "[a] permanent plan ... for [the children]" and authorized DCYF to prepare "a social study for the Termination of Parental Rights." The court again ordered the respondent to complete a psychological evaluation, to participate in counseling to address family violence issues, and to cooperate with DCYF in scheduling and keeping appointments related to court orders. The court further ordered that "[v]isitation [was to] remain at the discretion of [DCYF] in consultation with [the guardian ad litem]." Upon DCYF deciding to

resume visitation, the court ordered that "[r]egular meetings shall be established to discuss [the] goals and status of visitation" and that "visitation shall be supervised by a Parent Aide provider . . . at the parent aide agency." The record does not contain any evidence that the respondent made any effort to comply with the district court orders after the April 1999 review hearing.

On September 22, 1999, DCYF submitted a permanent plan to the court that recommended freeing Craig and Megan for adoption. In October 1999, DCYF filed petitions in probate court to terminate the respondent's parental rights over Craig and Megan. *See* RSA 169-C:24-a; RSA 170-C:5, III. In the petitions, DCYF alleged that the respondent failed to: (1) cooperate in the visitation plan, which resulted in her not visiting with her children since July 1998; (2) complete a court-ordered psychological evaluation; and (3) follow through with a program to address issues of domestic violence. The probate court held a termination hearing on October 13, 2000. After the hearing, the court found beyond a reasonable doubt that the respondent failed to correct the conditions leading to the findings of neglect despite the State's reasonable efforts, and issued an order terminating the respondent's parental rights over Craig and Megan. The respondent thereafter filed this appeal.

On appeal, she first argues that the probate court applied the wrong legal standard in deciding to terminate her parental rights. The probate court applied the standard set forth in RSA 170-C:5, III, which provides:

> The petition may be granted where the court finds that . . . [t]he parents, subsequent to a finding of child neglect or abuse under RSA 169-C, have failed to correct the conditions leading to such a finding within 12 months of the finding despite reasonable efforts under the direction of the district court to rectify the conditions.

The respondent argues that a showing of *"reasonable efforts* . . . to rectify the conditions [leading to neglect]" places a lower burden on DCYF than is required by our case law. *See State v. Robert H.,* 118 N.H. 713, 719 (1978); *see also In re Diana P.,* 120 N.H. 791, 798 (1980). Although the respondent states "[t]he legal standard underlying this issue is not precisely clear," she contends that this court enunciated a standard in *Robert H.* that requires DCYF to show that it made "every effort" to assist the parents to correct the conditions leading to neglect. *See Robert H.,* 118 N.H. at 718-19. The respondent's reliance on *Robert H.,* however, is misplaced.

In *Robert H.,* the court reviewed the burden of proof required before a court issues a termination order. *See id.* at 715-16. Although the statute imposed a "clear and convincing" burden upon the division, *see* RSA 170-

C:10 (1994), the court held that the division "must prove its case under chapter 170-C beyond a reasonable doubt before the permanent termination of liberty and natural rights of parents guaranteed under New Hampshire Constitution, part I, article 2 can occur." *Robert H.*, 118 N.H. at 716. Based on this constitutional ground, the court vacated the probate court's decision to terminate Robert H.'s parental rights.

The court then reviewed whether the division made an effort to assist and counsel Robert H. prior to seeking termination of his parental rights. *See id.* at 718. The court observed that the division's own regulation stated that it "has a particular responsibility . . . to ensure that *every effort has been made to enable the parents to provide a family for their own children* [and therefore the caseworkers] will need to include in their social studies not only evidence to justify the grounds of the petition, but also evidence of attempts, both by the Division and other agencies, to *work with the parents.*" *Id.* at 718-19. The court stated that in its dealings with Robert H., the division should not have ignored the mandate of its own regulation. *See id.* at 719. Therefore the court's conclusion that the division should have assisted and counseled Robert H. was based on its own regulation and not the constitution. *See In re Diana P.*, 120 N.H. at 798 (recognizing that court in *Robert H.* was "holding the division to its own regulations" when requiring it to make "every effort").

■ The regulation cited in *Robert H.*, moreover, is not intended to change the statutory standard applied by the probate court in determining whether to grant a petition. Rather, the regulation is promulgated by the department of health and human services and describes the procedures involved when DCYF files a petition for termination of parental rights. *See* RSA 161:2, II; *see also* DCYF MANUAL, section 6103, SR 77-45 (2001); *cf. Finlay Commercial Real Estate v. Paino*, 133 N.H. 4, 8 (1990) (holding rule promulgated by commission to regulate real estate brokers, which requires all real estate listing agreements be in writing, "does not in any way abrogate or dilute" common law rights that govern the agreement between a real estate broker and seller).

While DCYF may set more lofty goals for itself in dealing with its cases, the regulation cannot change the statutory burden to be applied by the probate court because, in carrying out the legislature's mandate, DCYF as an executive agency has no authority to change the law as established by the legislature. *See generally Petition of Strandell*, 132 N.H. 110, 119 (1989) ("Administrative rules may not add to, detract from, or modify the statute which they are intended to implement.") Consequently, to the extent that *Robert H.* and *Diana P.* may be interpreted as requiring that

the procedures described in the DCYF manual be applied by the probate court, they are overruled.

■ The legislature has provided the standards to be applied when the State seeks to terminate parental rights following a finding of neglect under RSA chapter 169-C. RSA 169-C:24-a (Supp. 2001) provides that although the State is required to file a petition for termination of parental rights

> [w]here a child has been in an out-of-home placement pursuant to a finding of child neglect or abuse, under the responsibility of the state, for 12 of the most recent 22 months; . . . the state may not be required to file a petition . . . if . . . [t]he state has not provided to the family of the child, consistent with RSA 170-C:5, III, such services and *reasonable efforts* as the state deems necessary for the safe return of the child to the child's home. In determining whether the state has made *reasonable efforts* to prevent placement and reunify the family, the district court shall consider whether services to the family have been accessible, available, and appropriate.

(Emphasis added.) Once the State files a petition to terminate parental rights, RSA 170-C:5, III requires the State to show it made *reasonable efforts* under the direction of the district court to rectify the conditions that led to the neglect finding before the probate court may grant the petition.

■ In this case, the probate court applied the standard set forth in RSA 170-C:5, III when it specifically found: "The evidence indicates that DCYF made reasonable efforts under the direction of the district court to rectify the conditions that led to the findings of neglect . . . including attempts to contact [the respondent] and arrange for the evaluation[] and programs that [the respondent] w[as] ordered to participate in." Therefore, the court applied the appropriate standard and committed no error.

The respondent next contends that the evidence presented at the hearing was insufficient to support the probate court's findings that the respondent failed to: (1) cooperate in the visitation plan, which resulted in her not visiting with her children since July 1998; (2) complete a court-ordered psychological evaluation; and (3) follow through with a program to address issues of domestic violence. "The findings of fact of the judge of probate are final unless they are so plainly erroneous that such findings could not be reasonably made." RSA 567-A:4 (1997). Consequently, on appeal, we will not disturb the probate court's decree unless it is

unsupported by the evidence or plainly erroneous as a matter of law. *In re Angel N.*, 141 N.H. 158, 161 (1996).

In this case, the court specifically "f[ound] beyond a reasonable doubt that [the respondent] has failed to comply with the dispositional orders of the Laconia District Court in that she has failed to cooperate with the visitation plan and has not visited with her children since July of 1998, that she has failed to cooperate in a court ordered psychological evaluation and has failed to follow through with a program to address issues of domestic violence." Further, the court found that "DCYF made reasonable efforts under the direction of the district court to rectify the conditions that led to the findings of neglect and abuse including attempts to contact [the respondent] and arrange for the evaluation[] and program[] that [the respondent] w[as] ordered to participate in."

■ The respondent first contends that the probate court's finding that she failed to cooperate with the visitation plan is unsupported by the evidence. Although the evidence supports the respondent's assertion that when she visited her children, the visits were productive, the evidence also supports the probate court's finding that she did not cooperate with the visitation plan. Along with the supervised visits, the visitation plan included an obligation on the respondent's part to attend regular meetings to discuss the goals and status of visitation. After her parent aide suspended visits in July 1998, the aide repeatedly attempted to contact the respondent to set up a meeting so that visitation could resume. Despite her parent aide's attempts to contact her, the respondent allowed more than two months to pass before she even attempted to resume visitation in October 1998. And after her October 1998 meeting with her DCYF caseworker, she failed to cooperate in fulfilling her caseworker's requests. Although she scheduled an appointment for a psychological evaluation, she did not show up at the appointed time. Additionally, she did not report to her caseworker that she had made any effort to address her domestic violence issues until March 1999. Finally, after the review hearing in April 1999 when the district court found that she was in non-compliance, the record demonstrates that she made no efforts to comply with the court order to resume visitation. Thus, ample evidence supports the probate court's finding that she failed to cooperate in the visitation plan.

■ The respondent next admits that she failed to obtain a psychological evaluation. She argues, nonetheless, that a psychological evaluation was not required because she had completed two psychological evaluations, one in 1991 and one in 1994, and DCYF had copies of these evaluations in its files. She further contends her failure to complete a psychological

evaluation is irrelevant in determining whether she failed to correct the conditions that led to the findings of neglect. We disagree.

The event that formed the basis of the neglect findings occurred in December 1997. By December 1997, the prior psychological evaluations were at least three years old, and therefore the district court was not unreasonable in ordering an up-to-date psychological evaluation. Moreover, in 1999, when we affirmed the findings of neglect, we observed that

> the respondent witnessed an episode of physical force directed upon her three-year-old son that horrified onlookers. The respondent, however, took no action whatsoever to protect Craig from repeated hits to the head by Todd T., and testified that what happened was no one else's business. Indeed, the respondent denied the assaults even occurred despite the fact that she witnessed them. The respondent's failure to acknowledge Craig's plight and involve herself on his behalf in such a violent situation raises grave concern for her ability then, and in the future, to protect Craig from other dangerous situations.

*In re Craig T.*, 144 N.H. at 587. Given the respondent's inability to appreciate her obligation to protect her children from physical, mental and emotional harm, ordering her to complete a psychological evaluation was a reasonable means to correct conditions that led to the neglect findings.

█ Finally, the respondent argues that the evidence does not support the trial court's finding that she failed to follow through with a domestic violence program. The only evidence in the record that the respondent followed through with a domestic violence program is the respondent's testimony that she attended a "domestic violence class ... [o]n Gilford Ave. in a church. [She] d[id]n't know what the name of the church was, [she] just knew how to get there." She further testified that from the group, she learned "[j]ust that [she] ha[s] a husband [and] that [she's] lucky to have him for a husband because he doesn't beat [her]." She also "felt sorry for [other people in the group], ... [b]ecause they'd keep on getting beaten and they wouldn't leave." She did not offer any testimony suggesting that she learned anything about protecting her children from domestic violence. The respondent's own testimony shows that she failed to appreciate the need to address the domestic violence that occurred within her own family. Thus, the record supports the probate court's finding that she failed to follow through with a program to address *her* issues of domestic violence. In failing to comply with the directions of the district

court, she failed to correct the conditions leading to the findings of neglect. Because the respondent has not demonstrated that the probate court's findings were unsupported by the evidence or plainly erroneous, we affirm.

*Affirmed.*

BRODERICK, J., sat for oral argument but did not take part in the final vote; BROCK, C.J., and NADEAU and DALIANIS, JJ., concurred.