Merrimack
No. 99-384

IN RE SAMANTHA L.

November 17, 2000

*Paula J. Werme*, of Boscawen, by brief and orally, for the respondent.

*Philip T. McLaughlin*, attorney general (*Ann F. Larney*, senior assistant attorney general, on the brief and orally), for the State.

NADEAU, J. The respondent, Kristina L., appeals orders of the Superior Court (*Smukler*, J.). The court found that the respondent's daughter, Samantha L., was an abused child, and vested legal custody in the New Hampshire Division for Children, Youth, and Families (DCYF). We affirm.

The record discloses the following facts. After spending the weekend at home with her mother, mother's friends, and family, Samantha L., then nine years old, was admitted to Concord Hospital on March 15, 1998, with extreme abdominal pain. The next day she was transported to Dartmouth-Hitchcock Medical Center and eventually diagnosed with pancreatitis, a ruptured spleen, hypertension, and suspicion of sexual abuse based upon observations of rectal bruising and an enlarged vaginal opening. Samantha spent two months in the hospital, including two weeks in the intensive care unit.

During the early period of hospitalization, Dartmouth-Hitchcock notified DCYF of Samantha's condition. On May 13, 1998, DCYF obtained an *ex parte* order from the Henniker District Court granting temporary custody of Samantha. *See* RSA 169-C:6-a (1995).

DCYF then filed a petition for abuse and neglect, and the district court held an adjudicatory hearing to determine whether Samantha had been abused. The district court concluded that Samantha was abused but found that the respondent did not cause the injuries and that the evidence was insufficient to find that she failed to protect the child.

The district court issued a dispositional order, placing custody of Samantha with respondent, but granting legal supervision of Samantha to DCYF. The district court also required psychological evaluations to be completed for Samantha, the respondent, and Samantha's father, Thomas R. The respondent refused to submit to the psychological evaluation and interfered with the guardian ad litem assigned to supervise Samantha's care.

The respondent appealed to the superior court. *See* RSA 169-C:28 (Supp. 1999). Finding that there was no dispute that Samantha suffered serious injuries, the superior court heard testimony from several witnesses regarding the cause of the injuries. The respondent offered at least eight alternative explanations for Samantha's injuries, ranging from "falling backwards on a rock or stick" to "jumping rope." She also identified several medical articles which allegedly supported her theories.

DCYF presented testimony from three medical experts. Drs. Storo and Moody concluded that Samantha's anal injury resulted from repeated penetrating trauma to her rectum. All three doctors agreed that the spleen injuries were caused by repeated blows by a blunt object to the abdomen. They further testified that none of the explanations offered by the respondent could have resulted in Samantha's injuries.

In its adjudicatory order, the court did not credit respondent's testimony regarding the causes of Samantha's injuries and chose to believe the three medical experts. The superior court agreed with the district court's findings both that Samantha had been abused and that it was unlikely that the respondent caused Samantha's injuries.

Nevertheless, the court was concerned about the danger of continued abuse. An investigating State Police officer who had interviewed Samantha on several occasions testified that "Samantha refuses to disclose the cause of her injuries out of fear." The court also found that the respondent "refuses to believe that any of [her friends or family members] abused Samantha" and that she "forbade nurses from touching Samantha and threatened to take her to another hospital, even when removal from Dartmouth-Hitchcock may have been life threatening to Samantha."

Following the adjudicatory hearing, the superior court heard motions filed by the respondent regarding outstanding discovery requests. The respondent sought audio and video tapes of interviews with Samantha as well as photographs and X-rays of the child's injuries. She also asked the superior court to seize all files related to this case from the State Police and DCYF, and to review those files *in camera* to determine if they contained any "exculpatory evidence." The superior court denied these requests as untimely.

The superior court next conducted a dispositional hearing and placed custody of Samantha with DCYF. The superior court based its decision upon two principal considerations: "(1) the seriousness of the abuse suffered by Samantha; and (2) the respondent's subjective disbelief that the abuse happened and [her] behavior flowing from that disbelief." The court further created a list of conditions that the respondent must meet before she could regain custody. The respondent appealed.

██ Although the respondent lists eleven issues in her notice of appeal, only three are adequately briefed for our review. Issues that are briefed with only "a passing reference [and] ignored in argument" are not preserved for appeal. *In re Estate of Leonard*, 128 N.H. 407, 409, 514 A.2d 822, 823 (1986).

First, the respondent argues that the superior court erred in failing to review the DCYF and State Police files *in camera*. Second, she argues that the superior court could not remove her child without first finding that she bore some culpability for her child's abused condition. The respondent's third argument, alleging violations of due process, has two components: (1) the court erred by discounting her testimony regarding the possible alternative causes of Samantha's injuries; and (2) the court erred by using her denial of abuse as a factor in its decision to remove Samantha.

██ We first address the discovery requests. Proceedings under RSA chapter 169-C are civil in nature, and do not put parents in the posture of criminal defendants. *See In re Heather D.*, 121 N.H. 547, 550, 431 A.2d 789, 791 (1981). Therefore, questions of criminal discovery requirements, prosecutorial disclosure, and "exculpatory evidence" are not at issue. We look to the standard guiding a civil proceeding: "The trial court has broad discretion in the management of discovery and the admissibility of evidence. We will not reverse the trial court's ruling unless there is a clear abuse of that discretion." *Bronson v. The Hitchcock Clinic*, 140 N.H. 798, 809, 677 A.2d 665, 672 (1996) (citation omitted). Additionally, the New Hampshire Rules of Evidence do not apply to abuse and neglect

proceedings; instead the court may admit evidence which it considers relevant and material. *See* RSA 169-C:12 (1994).

■ The superior court did not abuse its discretion by refusing to review *in camera* all State Police and DCYF files concerning this case. During the hearing on this matter, the respondent was granted copies of all transcripts of interviews that counsel requested. Further, the respondent was given the opportunity to review any audio recordings of these interviews at the offices of DCYF. She also had full access to the district court record, which included all color photographs that were offered as evidence of Samantha's injuries. Finally, regarding alleged letters that may have suggested Samantha's abuse was caused by accidental means, the trial court denied that request because it was based on the respondent's speculation, and because her request was untimely. We cannot say that the superior court abused its discretion in declining to review all files relative to this case *in camera.*

■ The respondent next argues that a court cannot transfer custody without finding that the parent abused the child or breached a duty to protect the child. We hold that a court can transfer custody to DCYF when it finds that the parent's behavior allows harm to occur to the child or threatens future harm to the child's life, health, or welfare. *See In re Melissa M.*, 127 N.H. 710, 713, 506 A.2d 324, 326 (1986); *cf. Petition of Jane Doe*, 132 N.H. 270, 277, 564 A.2d 433, 438 (1989).

The Child Protection Act provides that "[i]f the court finds that a child is abused or neglected, the court may order . . . [l]egal custody . . . be transferred to a child placing agency . . . ." RSA 169-C:19, III(a) (Supp. 1999). The statute defines "abused child" as one who has been "[s]exually abused; or [i]ntentionally physically injured; or [p]sychologically injured so that said child exhibits symptoms of emotional problems generally recognized to result from consistent mistreatment or neglect . . . ." RSA 169-C:3, II(a), (b), (c) (1994). "Neglected child" is defined as one who "is without proper parental care or control . . . ." RSA 169-C:3, XIX(b) (1994).

■ The superior court made sufficient findings to support its decision to transfer custody to DCYF. The court's dispositional order notes that it was guided by the seriousness of the abuse suffered by Samantha, and the behavior flowing from the respondent's denial of that abuse. The court explained:

> This lack of acceptance presents two serious risks to Samantha. First, given of [*sic*] the evidence of the family

> environment within which Samantha lived, the Court lacks confidence that the respondent can protect Samantha from the danger of a reoccurrence of the abuse. . . . Second, the refusal to accept the fact of abuse is itself destructive to Samantha; it tells Samantha that a very serious and traumatic event in her life should be denied, is of no consequence, and cannot therefore be processed.

Thus, the superior court's failure to find the respondent responsible for Samantha's physical abuse is not tantamount to a failure to find a causal link between harm or threatened harm to Samantha and the respondent's continued custody.

We have stated that harm or threatened harm "may be demonstrated by, for example, the severity of the intentionally inflicted injuries; recurring or a threat of recurring injury; or injury when a profile of the child's caretaker indicates a history of, or a propensity for, abuse." *Petition of Jane Doe*, 132 N.H. at 277-78, 564 A.2d at 438. We noted that "[t]hese examples are in no way intended to be limiting, as we recognize the myriad situations in which harm or threatened harm may exist." *Id.* at 278, 564 A.2d at 438. "Parental responsibilities come in many forms, some requiring the active involvement of the child's parent." *In re Craig T.*, 144 N.H. 584, 588, 744 A.2d 621, 624 (1999) (quotations omitted).

When a parent shirks the responsibility to assist a child in coping with abuse or fails to recognize that the abuse occurred, that child falls within the definition of an abused and neglected child under the Child Protection Act, and can be removed from parental custody. When a court finds a sexually and physically abused child in the custody of a parent unwilling to take steps to remedy the consequences of the abuse, we will not say the court is helpless to act.

■ Today we hold that when a court finds a parent refuses to acknowledge the abuse of a child, and demonstrates an unwillingness or inability to protect the child from future abuse, those findings justify the transfer of custody to DCYF.

The respondent contends that she cannot be held accountable for the abuse of her daughter, or the threat of continued harm to her daughter, unless a court first finds that she had particularized reasons to foresee harm caused by others. Assuming, without deciding, the respondent is correct, it should be foreseeable to a parent that the denial of her child's abuse will have grave consequences both in her ability to protect the child from future harm and in her ability to deal with physical and emotional trauma that the child may endure.

■ We now address the respondent's due process arguments, which focus upon the adequacy of her notice and hearings. We analyze her claim under the State Constitution first. *See State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983). "We have long recognized the right to raise and care for one's children as a fundamental liberty interest protected by Part I, Article 2 of the New Hampshire Constitution." *Petition of Kerry D.*, 144 N.H. 146, 149, 737 A.2d 662, 665 (1999). Because the State Constitution is at least as protective of individual liberties in this area as the Federal Constitution, we need not conduct a separate federal inquiry. *See In re Tracy M.*, 137 N.H. 119, 122, 624 A.2d 963, 965 (1993).

The respondent first argues that she was unprepared to confront DCYF's position that her "failure to believe" the abuse occurred threatened harm to Samantha. She raises similar concerns about the court's findings that she failed to provide an "adequate explanation" for Samantha's abuse. She contends that due process requires that she be given a hearing to demonstrate that her "failure to believe" and "failure to explain" do not render her unfit.

The respondent misconstrues the purpose of the adjudicatory and dispositional hearings under RSA chapter 169-C. We recognize that "a natural or adoptive parent who has not been found to have abused or neglected his or her child may not be deprived of custody of the child unless after a full hearing the State has proved the parent unfit to exercise custody of the child." *In re Bill F.*, 145 N.H. 267, 276, 761 A.2d 470, 476. RSA chapter 169-C provides the "judicial framework to protect the rights of all parties involved in the adjudication of child abuse or neglect cases." *In re Tracy M.*, 137 N.H. at 123, 624 A.2d at 965 (quotations and emphasis omitted).

■ The respondent received the full measure of judicial process that the Child Protection Act provides. She was afforded two fact-finding hearings after which courts determined that her continued custody posed a threat to the welfare of her daughter. We will not jeopardize the well-being of Samantha any further by requiring a petition to iterate specific unfitness.

■ The respondent's second due process argument is that the judge erred in discrediting the evidence concerning alternative theories for Samantha's injuries. "Trial courts are necessarily given broad discretion in the assessment of a witness's credibility and in the weighing of testimony." *Parkhurst v. Gibson (Parkhurst)*, 133 N.H. 57, 67, 573 A.2d 454, 459 (1990). The superior court weighed the medical testimony of three examining doctors against the testimony of the respondent and sided with the medical experts. This is not an

abuse of discretion and does not offend the respondent's due process rights.

Accordingly, we affirm the superior court's order.

*Affirmed.*

HORTON, BRODERICK, and DALIANIS, JJ., concurred; GROFF, J., superior court justice, specially assigned under RSA 490:3, concurred.